Spectok, Commissioner,
concurring:
I concur in this decision and believe it to be strongly supported by the record. However, I do not join in the opinion of the majority of the panel because that opinion is not predicated, as it states, “on somewhat different reasoning” from that set forth in Trial Commissioner Arens’ opinion, but rather is based on substantially the same reasoning. I *936 would therefore prefer merely to adopt Commissioner Arens’ opinion, in which he concludes as we all do, that plaintiffs have an equitable claim in the moral or nonjuridical sense traditionally used in Congressional Reference cases.
Findings oe Fact

Congressional Proceedings

1. (a) On January 10, 1967, during the 1st Session of the 90th Congress, there was introduced in the House of Representatives, a bill, HR. 1624, providing in part as follows:
* * * That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to each of the following named persons the amounts set forth opposite their respective names in full settlement of their claims against the United States for losses and damages they suffered due to the flooding of their lands due to the release of waters of the Wappapello Reservoir on or about September 25, 1965, without warning or notice which would have enabled them to take steps to avoid or minimize losses from the flooding caused by that release:
Tenant Landlord Acres Damages Dam-(name and address) (name and address) farmed to tenant ages to landlord
Sherman Webb, Qulin, Self. 185 $3,587.50 .. Missouri.
Hershel 0. Vernon, Route 1, Taylor TTnderwood, 145 2,104.00 $1,052.00 Fisk, Missouri. Route 1, Fisk, Missouri.
T. D. Burleson, Dexter, Louise Bombolasbi, 400 3,261.34 1,630.66 Missouri. Route 1, Dudley, Missouri.
LeRoy Cato, Route 1, E. B. Bowie, Route 1, 140 3,306.67 1,663.33 Dudley, Missouri. Dudley, Missouri.
Milburn Taylor, Route 1, .do. 150 2,200.00 1,100.00 Dudley, Missouri.
Loyd Thompson, St. Marlin Tinsley, Granite 70 1,366.67 683.33 Francis, Arkansas. City, Illinois (2210 Illinois Aye.)
Pete Sandlin, Route 1, E. B. Bowie, Route 1, 160 3,876.00 1,938.00 Dudley, Missouri. Dudley, Missouri.
Arvil Bowie, Route 1, do. 280 5,197.34 2,598.66 Dudley, Missouri.
BenW. White, Route 1, Self. 290 4,100.00 . Campbell, Missouri.
H. L. Underwood, Route 1, .do. 80 492.00 . Campbell, Missouri.
Joe Vanderfeltz, Route 1, do. 80 252.00 . Campbell, Missouri.
Clem Bader, Route 1, .do.. 340 1,414.00 ... Campbell, Missouri.
E. B. Bowie, Route 1, .do. 800 31,430.00 . Dudley, Missouri.
*937 Tenant Landlord Acres Damages Dam-(name and address) (name and address) fanned to tenant ages to landlord
W. H. Bowling, Route 1, E. B. Bowie, Route 1, 380 $7,462.67 $3,731.33
Virgil T. Low, Route 2, Self.. 612 4,760.00 .
Lawrence Sherfius, Route 1, Dudley, Missouri. Louise Bombolaski, Route 1, Dudley, 240 6,835.50 2,917.75
Robert Feiser, Route 1, Campbell, Missouri. John Feiser, Route 1, Campbell, Missouri. 16 753.34 376.66
Do..... Armstrong Cork Co., Route 1; Campbell, Missouri. 19 886.66 443.34
Robert Feiser, Route 1, Campbell, Missouri. L. F. Feiser, Route 1, Campbell, Missouri. 7 326.66 163.34
Do.. Self. 7 490.00 .
John F. Stenger, Route 1, _do. 65 602.80 .
Marvin Fadler, Route 1, Bemie, Missouri. Joe Osborn and Jack Osborn (partners), 969 13,348.05 6,674.02
Do. J, D. Flagg, Piggott, 396 3,217.46 1,608.73
Robert White, Route 1, Bemie, Missouri. Joe Osborn and Jack Osborn (partners), 600 15,950.00 7,975.00
Jerrell Stone, Route 1, Bemie, Missouri. Billie J. Barker, Route 1, Bemie, Missouri. 240 2,930.34 1,465.16
Rex L. Young, Route 1, Jack Bowie, Route 1, 650 7,757.87 3,878.93
Cranston C. Smith, Route 1 Self. 117 3,787.50 ..
Ornas Shipman, Bemie, Missouri. Elmo Moore, Piggott, Arkansas. 170 1,355.47 677.73
Kenneth Minton, Route 3, Self. 1,105 11,790.00 .
E. A. Hawkins and H. A. Hawkins, Route 3, Missouri. E. B. Bowie, Route 1, Dudley, Missouri. 1,095 17,766.67 8,883.33
Amos Linville, Route 1, Missouri. Self. 105 2,003.00 .
Jess Creecy, Route 1, Dudley, Missouri. Louise Bombolaski, Route 1, 173 4,503.01 2,251.51
John L. Bowie, Fisk, Missouri. E. B. Bowie, Route 1, Dudley, Missouri. 700 18,918 67 9,459.33
.
Lofton Linderman, Fisk, _do. 76 1,182.00 .
Mike Feiser, Route 1, _do. 95 848.70 .
H. B. Talkington, Dexter, Missouri. Louise Bombolaski, Route 1, Dudley, 360 5,491.20 2,745.60
B. N. Maxwell, Route 1, Campbell, Missouri. Self. 75 1,687.50 ..
Missouri. .
Dud C. Lewis, Route 2, Piggott, Arkansas. _do. 153 2,938.46 .
Fred Templemire, Route 1, Missouri. .
Lee Lipsey, Route 1, _do. 80 1,080.00 .
O. Q-. Branch, Route 1, E. B. Bowie, Route 1, 180 2,017.34 1,008.66
Dudley, Robert Stoner, Route 1, _do. 250 4,282.67 2,141.33
Do. Louise Bombolaski, Route 1, Dudley, 288 7,498.67 3,749.33
Elmer Battles. Route 1, Dudley, Missouri. E. B. Bowie, Route 1, Dudley, Missouri. 100 1,669.34 834.66
*938 (b) A similar bill, H.R. 16309, had previously been introduced on July 18, 1966, in the House of Representatives during the 89th Congress, and a hearing thereon had been conducted on September 15, 1966, by a subcommittee of the Committee on the Judiciary to which the bill had been referred.
(c) On August 17,1967, a hearing on the bill, H.R. 1624, was conducted by a subcommittee of the Committee on the Judiciary to which the bill had been referred.
(d) On March 13, 1968, during the 2d Session of the 90th Congress, there was submitted in the House of Representatives a resolution, H.R. Res. 1098, providing:
Resolved, That the bill (H.R. 1624) entitled “A bill for the relief of Sherman Webb, and others”, together with all accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.
(e) On April 1, 1968, the Committee on the Judiciary of the House of Representatives in Report No. 1236 reported favorably, without amendment, the bill, H.R. Res. 1098.
(f) On May 21, 1968, H.R. Res. 1098 was adopted by the House of Representatives.
(g) On May 27, 1968, the Clerk of the House of Representatives certified and referred the pertinent documents in the case to the Chief Commissioner of the United States Court of Claims.

Oourt Proeeedmgs

2. (a) On June 10, 1968, plaintiffs filed their petition, addressed to the Chief Commissioner.
(b) On Jume 14, 1968, the Chief Commissioner issued an order of reference to a trial commissioner and a designation of a review panel.
(c) On July 22, 1968, plaintiffs filed their first amended petition.
(d) On August 16, 1968, defendant, the United States of America, filed its answer.
*939 (0) On September 19,1988, a pretrial conference was conducted by the trial commissioner at which time exhibits were introduced into evidence by both parties and counsel stipulated that the itemization of damages set forth in H.R. 1624 (above referred to) and totaling $295,790.24 was correct. Defendant’s counsel did not, however, concede any liability, legal or equitable, on the part of defendant.
(f) On January 16, 1969, plaintiffs filed their second amendment to the petition.
(g) On January 31, 1969, defendant filed its answer to plaintiffs’ second amendment to the petition.
(h) On March 4 and 5, 1969, a trial was conducted by the trial commissioner at Cape Girardeau, Missouri, at which time additional exhibits were introduced into evidence and oral testimony was adduced by both plaintiffs and defendant.
(i) On April 11,1969, plaintiffs filed their proposed findings of fact, brief and argument.
(j) On July 2,1969, defendant filed its proposed findings of fact and brief.
(k) On July 23, 1969, plaintiffs filed their objections to defendant’s proposed findings of fact, and their reply brief and argument.

Plaintiffs’ Claim

3. (a) Plaintiffs were at all pertinent times the legal owners of certain crops, principally soybeans, growing on about 8,000 acres of land in Stoddard, Dunklin and Butler Comities, in southern Missouri, and in Clay County, Arkansas, all bordering on the St. Francis River. The land is located from about 22 to 79 miles south of Wappapello Dam and Reservoir situated in Wayne County, Missouri, on the St. Francis River.
(b) The St. Francis River flows in a southerly direction in a snake-like pattern and has a capacity to hold within its banks water releases from all sources (including releases from the dam and from drainage ditches below the dam) of *940 3,000 to 4,000 cubic feet a second (cfs) before overflowing. Flood stage of the river is from 17 to 20 feet. Water from the dam takes 2 days to reach a point in the river opposite the northern-most area of the above land and 7 days to reach the southern-most area.
(c) Plaintiffs claim that the damage to the crops, itemized in H.R.. 1624 (above referred to) and agreed by defendant as being correct as itemized and in total amount, was the direct and proximate result of the unnecessary release by defendant, without warning, of water from the reservoir in an amount far exceeding the capacity of the St. Francis River channel, with resulting flooding of plaintiffs’ land.
(d) Defendant, in addition to asserting that plaintiffs are not entitled to recover as a matter of law, asserts that:
(1) the damage to plaintiffs’ crops was caused by natural flooding as a result of unusually heavy and unprecedented rainstorms which occurred in September 1965, below and above the dam and reservoir;
(2) such damage occurred in marginal areas which were subject to natural flooding prior to and since the construction of the dam and reservoir, and that plaintiffs assumed the risk of damage by such flooding when they planted their crops in such areas;
(3) defendant operated the dam and reservoir in a proper manner with due and careful regard for existing circumstances and contingent weather conditions;
(4) by limiting the outflow from the reservoir, defendant prevented much greater flooding and more extensive damage than would have occurred to plaintiffs’ crops and land if they had not benefited by the partial protection afforded by the dam and reservoir;
(5) because of the unusually heavy rains in September 1965, above and below the dam and reservoir, many of plaintiffs’ marginal lands would have been flooded with resulting crop losses even though the outflow from the reservoir had been restricted to 3,000 cfs during the periods of heavy rainfall; and
(6) the damage to plaintiffs’ crops occurred several weeks prior to the normal harvesting period and the crops were not ready for harvest at the time the flooding occurred.

*941
Flooding Prior to Construction of the Dam

4. (a) Prior to construction of the dam and reservoir in 1941, St. Francis Fiver discharges in excess of channel capacity at the area where the dam and reservoir are presently located were as follows:

Bate of discharge (in cubic feet

Date: per second)
Avgust 1915_ 85,000
May 1920_ 37,300
April 28, 1921_ 42,700
April 23, 1922_16, 000
May 17, 1923_ 27,200
May 31, 1924_10, 300
November 9,1925_ 23, 000
February 27, 1926_14,400
April 16, 1927_49,100
June 22, 1928_ 34,700
May 15, 1929_ 24,400
January 15, 1930_ 34, 600
March 9, 1931_J_ 9, 420
December 26, 1932_15, 900
May 15, 1933_ 82, 500
April 8, 1934_ 5, 960
March 12, 1935_ 56, 300
November 5, 1936_11,400
January 16, 1937_ 40, 500
February 20, 1938_31, 000
April 18, 1939_ 27,300
April 21, 1940_ 5,400
Since the channel capacity of the river is 3,000 to 4,000 cfs, it is evident that severe flooding resulted below the present location of the dam and reservoir.
(b) At all of the times above indicated, the lands herein involved were mostly wooded, so that the damage from the flooding was relatively slight.

Construction of the Dam a/nd Reservoir

5. (a) The Wappapello Dam and Keservoir project was constructed by the then Department of War pursuant to various Congressional flood control measures. (33 TJ.S.C. § 702, et seq.) The primary purpose of the Wappapello Dam *942 and Reservoir was to give flood control protection to all areas below the dam, extending some 200 to 250 miles downstream where the St. Francis River flows into the Mississippi River. The area to be protected includes plaintiffs’ lands which are located on the St. Francis River from about 22 to 79 miles south of the dam.
(b) The spillway crest (top of the dam) is 394.74; feet MSL (Mean Sea Level), with a maximum storage capacity in the reservoir of 625,000 acre-feet. With full reservoir the outflow is 18,000 cfs. A pool elevation in the reservoir of 385 feet MSL represents an impoundment of 415,700 acre-feet. There are three tunnels about a mile long through the base of the dam, in each of which is an electrically operated gate to control the outflow of water. The reservoir is cone-shaped, with an increasingly greater area for accommodation of water as it rises. In normal operation, there is a minimum water level in the reservoir of 355 feet MSL with 38,600 acre-feet in the reservoir, which is maintained by a conservation weir.
(c) In the acquisition of the property upon which the dam and reservoir are situated, the Government acquired land behind the reservoir up to an elevation of 400 feet MSL. This land was then leased by the Government to private parties, with the leases providing that the land was subject to flooding if the elevation of the water in the reservoir reached 364 feet MSL.
(d) The original plan for the project provided for a flood-way below the dam with levees on each side of the St. Francis River to accommodate releases up to 10,000 cfs. The levees on the west bank were constructed soon after the completion of the reservoir, but because of failure to acquire rights-of-way, the planned levee for the east bank was never constructed.
(e) There are various gauges which reflect the elevation of the water in the reservoir and the elevation of the water downstream.

Operation of the Dam and Reservoir

6. (a) In June 1941, the dam and reservoir were put into operation under the control of the United States Army Corps *943 of Engineers, with District Headquarters in Memphis, Tennessee, and Division Headquarters in Vicksburg, Mississippi.
(b) Notwithstanding the fact that the levee system originally planned had not been completed, the initial plan of operation, known generally throughout the area, called for a maximum release of water from the dam of 10,000-cfs in an “all season” plan, without deviation during any part of the year. In other words, under the plan, after the height of the conservation weir was reached, there was to be no restriction on the outflow until it reached 10,000 cfs, at which point the gates would be activated. Accordingly, until the maximum of 10,000 cfs was reached, the outflow was, for all practical purposes, controlled by inflow caused by rains. Since the capacity of the St. Francis Eiver to hold within its banks waters from all sources is 3,000 to 4,000 cfs (finding 3(b), supra), it is obvious that when the outflow from the dam exceeded this rate, flooding occurred.
(c) Clearing of the lands herein involved, which as previously indicated (finding 4(a), supra) had been mostly wooded, began in 1953, but most of the land was cleared in the period from 1963 to 1965.
(d) In 1963, the Corps of Engineers entered into an agreement with the Missouri Conservation Commission,'in the interest of recreation and sports activities, to maintain the reservoir water level from May 1 to December 15, at approximately 359 feet MSL, which was 4 feet above the weir elevation. There was, however, no other change in the plan of operation which might at any time affect the 10,000 cfs maximum outflow.

Floodmg After Construction of the Dam

7. (a) After the dam and reservoir were put into-operation, the amount of flooding was substantially reduced, although as indicated in the below chart, on several occasions between November 2,1941, and April 8,1964, there were discharges from the dam at a rate which caused flooding downstream.
*944 Rate of discharge (in etibio feet Date: per second)
11/2/41 _ 7,640
4/11/42 _ 7,260
12/30/42 _ 9,270
5/25/43 _ 6,430
4/16/45 _21, 800
2/15/46 - 10,400
5/18/46 _10,400
6/3/46 _ 7,430
4/13/47_ 7,040
4/27/47 _ 9,960
1/3/48 _10,000
4/2/48 _ 6,800
2/4/49 _10,900
3/28/49 _ 9,140
10/23/49 _ 6,540
1/18/50 _10,500
2/15/50 _10, 000
4/5/50 _10,000
5/14/50 _10,200
2/23/51 _ 9,990
7/15/51 _ 6,390
11/26/51 _ 9,410
3/13/52 _ 8,490
4/15/52_ 7,170
6/11/54 _ 6,910
3/23/55 _ 9,700
4/6, 9, 10/57_10,100
5/23, 26, 27, 29, 30/57_10,000
6/1, 7, 8, 9/57_•_10,100
7/4/57 _10, 000
11/20/57 _ 7,240
12/21/57 _ 9,450
3/27/58 _10,060
5/7/58 _ 9,090
7/20/58 _ 7,880
11/19/58 _ 8,220
12/20/59 _ 7,190
3/8,9/61_ 8,280
5/13/61 _10,140
1/24/62 _ 8,700
3/23/62 _ 8,850
3/14, 16/64_10,100
4/8/64 _ 7,220
*945 (b)The months of August through November are generally considered in the area to be “dry” months in which rainfall and consequent outflow from the dam are less than during the other months. It is clear from the above chart that between 1941 and 1964, flooding never occurred in the “dry” months of August and September, and that flooding occurred only once in October and four times in November.

Events of September 1965

8. (a) In September 1965, prior to September 11, the outflow from the dam did not exceed 330 cfs and the elevation of the St. Francis Biver was less than 4 feet.
(b) On September 11 and 12 unusual and unprecedented rains for September fell above and below the dam area in the wake of Hurricane Betsy which had struck the Gulf Coast on the 10th of the month and had moved northward. Additional heavy rains fell in the area on September 14,15 and 16. The outflow from the dam, however, during this period (11th to 16th) did not exceed 1,600 cfs and the elevation of the St. Francis Biver did not exceed 14.2 feet. Thereafter, the outflow from the dam dropped from a maximum of 936 cfs on the 17th to 620 cfs on the 21st and the elevation of the river did not at any time exceed 13.40 feet.
(c) On September 22, additional heavy rains fell above and below the dam area and on that day the outflow from the dam rose to 2,270 cfs. Local flow into the river (from drainage ditches, etc.) below the dam aggregated about 1,400 cfs. The elevation of the river did not, however, exceed 13.40 feet.
(d) On September 23, slight rain fell near the dam but heavy rains fell below the dam and on that day the outflow from the dam rose to 6,250 cfs. Local flow into the river below the dam rose to an aggregate of 3,800 cfs. Though the capacity of the St. Francis Biver is sufficient to hold within its banks only 3,000 to 4,000 cfs of water flow, the evidence does not establish to what extent plaintiffs’ lands were flooded on September 23 by the combination of local flow of 3,800 cfs and waters released from the dam several days earlier (roughly 600 cfs). In any event, any flooding caused thereby *946 was transitory and temporary since by September 24, local inflow dropped to 1,200 cfs and by September 25, local inflow was zero.
(e) On September 24, the outflow from the dam rose to 7,000 cfs. Local flow into the river below the dam was 1,200 cfs. The elevation of the river reached 21.60 feet (flood stage). The United States Army Corps of Engineers, in response to complaints from plaintiffs that their crops were being flooded, ordered that the maximum outflow from the dam be reduced from an authorized 10,000 cfs to 7,000 cfs. The United States Army Corps of Engineers knew that the lands herein involved were planted in crops which would be flooded when the 3,000 to 4,000 cfs capacity of the St. Francis Fiver was exceeded.
(f) The record does not establish that there was a significant cumulative effect on the elevation of the river, and consequent flooding, by the occurrence on the same days, as above indicated, of the increased outflow from the dam and the flow into the river from sources below the dam. (See finding 3 (b), supra, in which it is noted that water from the dam takes from 2 to 7 days to reach a point in the river opposite the lands herein involved.) It is clear, moreover, that the flow into the river from local sources was not sustained over a lengthy period of time, as was the increased outflow from the dam.
(g) During the period from September 25 through the remainder of September, the outflow from the dam went from a high of approximately 7,000 cfs to a low of 4,250 cfs, all of which was, of course, in excess of the capacity of the St. Francis Fiver. The elevation of the river continued at flood stage, with readings of approximately 22 to 24 feet elevation.. There is no indication in the record of any rainfall either above or below the dam, nor is there any indication of any flow into the river from sources below the dam during this period.
(h) From September 1 through September 22, the elevation of the water in the reservoir was between 358.74 and 359.07 feet MSL. From September 23 through September 30, the elevation of the water in the reservoir went, from a high of 365.94 feet MSL on September 23 to a low of 361.25 feet *947 MSL on September 30. The highest elevation of the water in the reservoir (365.94 feet MSL) was thus 28.80 feet below the spillway crest (394.74 feet MSL) and represented an im-poundment of 134,080 acre-feet. The peak inflow into the reservoir was 32,230 cfs on September 23. This was after a sudden and progressive increase over the preceding day or two, and was followed by an equally sudden and progressive decline over the succeeding day or two.
(i) During the month of September, the total precipitation in the area of the dam and reservoir was 10.38 inches, whereas the normal precipitation in such area for September was 3.24 inches. The evidence shows that because of dry conditions in early September, the 10.38 inches of rain produced only 2.10 inches of runoff into the reservoir, but that any additional rain would have resulted in about 70 percent runoff. The reservoir could have taken 7 inches more runoff before reaching the spillway crest (394.74 feet MSL), which would have required about 10 more inches of rain, a highly improbable and unlikely event.

The Notice Issue

9. (a) On September 23, 1965, the United States Corps of Engineers (although not specifically charged by law or regulation to do so) sent a bulletin to the local offices of the Weather Bureau of the United States Department of Commerce warning of the impending flood stages of the St. Francis River and suggesting that protective measures be taken. This warning was transmitted by the Weather Bureau to certain radio stations serving the general area, although apparently it was not sent to stations located in the immediate area which was flooded.
(b) Testimony and exhibits introduced at the trial-by both parties establish that the majority of the types and varieties of crops planted by plaintiffs, particularly soybeans, were not ready for harvest on the dates the damage to the crops occurred.
(c) The evidence does not establish that the damage to the crops could have been significantly mitigated by an earlier or more extensively broadcast notice of the impending flooding.
*948 10. In April 1966, as a result of studies which, were conducted by the United States Army Corps of Engineers over the period of several months, a plan of operation was formulated providing for variable rates of maximum releases from the dam. Under this plan which was placed into effect in October 1967, the maximum outflow from the dam from August 1 through November 30 of each year is 3,000 cfs until the elevation of the water in the reservoir reaches 384.74 feet MSL (10 feet below the spillway crest). When the water in the reservoir rises above 384.74 feet MSL, the maximum outflow from the dam is increased to 7,000 cfs.

Trial Testimony

11. The testimony and exhibits at the trial are incorporated in the foregoing findings. The following additional testimony was given at the trial:
(a) Plaintiffs’ expert, a consulting drainage engineer, testified that if the outflow from the dam had been limited during September 1965 to 3,000 cfs, the elevation of the water in the reservoir would not have reached a level approaching 380 feet MSL, and that there would have been no flooding.
(b) Defendant’s expert, the chief of the Operation Division of the Memphis Engineer District of the United States Army Corps of Engineers, testified that had the outflow from the dam been limited to 3,000 cfs there would have been no flooding; that at the time in question he felt that there would be “considerable risk” in reducing the outflow to 3,000 cfs because he “didn’t know how much more it was going to rain.” He further testified that a computation could have been made without difficulty to determine how long it would be before the dam would reach its maximum capacity, assuming a cutback of outflow to 3,000 cfs and a continuation of the rise in water level of the reservoir; but that he did not know whether anyone made such a computation. He estimated, however, that if the outflow had been so reduced, and if the rain had continued, it would have been “a matter of days” before the danger point would have been reached where the water would have gone over the spillway.
(c) Defendant’s expert, the chief of the hydraulics branch, Engineering Division of the Memphis Engineer District of *949 the United States Army Corps of Engineers, testified that if at the time in question the outflow from the dam had been reduced to 3,000 cfs, the water in the reservoir would have risen to 366 feet MSL, or 18.74 feet below the 384.74-foot level referred to in the April 1966 plan (finding 10, supra). He further testified that in retrospect the margin of safety was too wide and that “we were very conservative” and “probably way off base,” but that the United States Army Corps of Engineers did not at the time in question know how intense the rain would be and that he was apprehensive that if the outflow would be reduced to 3,000 cfs “we could get enough rain” to result in a rise of the water in the reservoir up to and over the spillway crest. He further testified that the rate at which water was released through the dam was determined by the flowage necessary to maintain the reservoir at 359 feet MSL, in accordance with agreements with the Missouri Conservation Commission, and “ha[d] nothing to do with flood control.”
(d) The evidence fails to establish why the United States Army Corps of Engineers did not utilize its accumulated knowledge and experience regarding the relationship between continued rainfall and the increase of pool elevation in the reservoir.
Ultimate Findings and Conclusions
12. (a) Considering defendant’s assertions (finding 3(d), supra), in light of the facts, it is concluded that:
(1) the damage to plaintiffs’ crops was not caused by natural flooding, but by the unnecessary release of excessive amounts of water from the dam;
(2) there was no assumption of risk by plaintiffs of the flooding that occurred;
(3) in operating the dam and reservoir, defendant did not give proper deference to the primary purpose of downstream flood control, but rather gave priority to maintaining the level of the reservoir to satisfy agreements with the Missouri Conservation Commission;
(4) the fact that plaintiffs would have suffered greater damage had there been no dam, does not bear on the issue of the causation of the damage to plaintiffs’ crops; and
( 5) although the maj ority of plaintiffs’ crops were not ready for harvest at the time the flooding occurred, the *950 damage inflicted by the flooding prevented a subsequent harvest.
(b) Had the United States Army Corps of Engineers reduced the outflow of the dam at the time in question to 3,000 cfs, the water in the reservoir would not have arisen beyond 366 feet MSL (28.74 feet below the spillway crest) and there would have been no flooding of plaintiffs’ land and no damage to their crops.
(c) The failure of the United States Army Corps of Engineers to so reduce the outflow, constituted, under all the facts and circumstances, an unjustified omission to act that was the direct cause of plaintiffs’ loss.
■ (d) Although plaintiffs do not have a legal claim against the United States, they do have a valid equitable claim, and, accordingly, there is equitably due them from the United States the amounts set forth in H.E. 1624 of the 90th Congress, 1st Session, quoted in finding 1(a), supra.
[See Priv. L. No. 91-167, approved September 26, 1970, 84 Stat.]